## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT A. SWAIM
6112 Tidefall Court
Wilmington, NC 28403,

                    Plaintiff,

        v.

JOHN PHELAN, SECRETARY OF THE
NAVY, UNITED STATES OF AMERICA,
in his official capacity,
1000 Navy Pentagon
Washington, DC 20350,

UNITED STATES DEPARTMENT OF THE
NAVY
1000 Navy Pentagon
Washington, DC 20350, and

BOARD FOR CORRECTION OF NAVAL
RECORDS
701 S. Courthouse Road
Building 12, Suite 1001
Arlington, VA 22204,

                    Defendants.

Civil Action No. _____

## I.    STATEMENT OF THE CASE

1.      Plaintiff Robert A. Swaim ("Mr. Swaim"), a veteran of the Unites States Navy

("Navy  or "the Navy"), brings this action under the Administrative Procedure Act, 5 U.S.C. §

701 *et seq* ("APA"), for judicial review of a denial of his application for medical retirement

based on service-connected Post Traumatic Stress Disorder ("PTSD") by the Navy. Despite the

Navy's own Board for Correction of Naval Records ("BCNR" or "Board") concluding that Mr.

Swaim suffered from unfitting PTSD resulting from his military sexual trauma ("MST") and

recommending his medical retirement, the Secretary of the Navy's Delegate rejected that recommendation, which was arbitrary, capricious, contrary to law and without support of substantial evidence.

2.  Mr. Swaim served his country honorably on active duty in the Navy from January 19, 1955, to December 16, 1957. He was a healthy, well-adjusted seventeen-year-old at the time he entered the Navy. Over the course of his four months of initial training, Mr. Swaim was brutally and repeatedly physically and sexually assaulted, as well as psychologically traumatized by his commanding officer and other servicemembers. In the span of a few months, Mr. Swaim went from a healthy teenager who aspired to a long Naval career to someone so terrorized by the trauma he experienced that he developed physical and mental symptoms consistent with what we now know as PTSD. Those symptoms included "anxiety, depression, suicidal thoughts and attempts, lack of concentration, inability to sleep more than three to four hours per night, intrusive ideation, nightmares, hypervigilance, and classic symptoms of attention regulation difficulties[.]" He also developed a duodenal ulcer condition as a result of the stress from the traumatic experiences he endured.

3.  During a lengthy hospitalization for an anxiety condition and ulcers and shortly after giving a written report of his traumatic experiences to a nurse, the Navy medically separated Mr. Swaim solely for the ulcer condition. Despite the clear documentation that he was experiencing serious psychological symptoms in addition to the symptoms of his ulcer condition, the Physical Evaluation Board ("PEB") failed to consider whether Mr. Swaim was unfit as a result of any mental or psychological conditions.

4.  The Physician Advisor concluded that Mr. Swaim's in-service medical records— documenting anxiety-related symptoms such as "nervousness," "neurasthenia," and

"hyperventilation syndrome due to an underlying anxiety neurosis," along with prescriptions for sedatives—reflected manifestations of what would today be recognized as PTSD. The Physician Advisor explained that ulcers are frequently caused by chronic stress and underlying anxiety disorders and opined that the available clinical evidence supported a finding that Mr. Swaim was unfit for service "due not only to his duodenal ulcer, but also for his PTSD." The medical advisor made clear that Mr. Swaim's PTSD symptoms would warrant a diagnosis and retirement in their own right.

5.      Relying on the advisory opinion and the record evidence, the Board concluded that Mr. Swaim suffered from undiagnosed PTSD during service as a result of military sexual trauma, and that this PTSD condition contributed to the development of the duodenal ulcer for which he was medically separated. The Board further found that it was an injustice that the Navy failed to consider Mr. Swaim's PTSD in its fitness determination, and that had it been properly recognized, Mr. Swaim would have received a medical retirement. Accordingly, the Board recommended that Mr. Swaim's record be corrected to reflect a medical retirement based on unfitting PTSD and duodenal ulcer, with a combined disability rating of 40 percent.

6.      The Board's recommendation was referred to the Navy's Assistant General Counsel (Manpower and Reserve Affairs), as the delegate of the Secretary of the Navy (herein, the "Secretary Delegate"), for final approval.

7.      The Secretary Delegate disapproved the BCNR's recommendation to medically retire Mr. Swaim, despite concurring with the Board's core factual findings. Specifically, the Secretary Delegate acknowledged that Mr. Swaim developed PTSD during his service in the Navy as a result of military sexual trauma, and that his PTSD contributed to the duodenal ulcer condition for which he was found unfit and separated. However, the Secretary Delegate rejected

the legal standard applied by the Board and its Physician Advisor. In his view, the recommendation improperly relied on the current disability evaluation framework, codified at 10 U.S.C. § 1216a, which requires that all conditions contributing to unfitness—individually or collectively—be considered in determining disability retirement eligibility and rating. The Secretary Delegate emphasized that this statute did not exist in 1957 and should not be applied retroactively to Mr. Swaim's case. The Secretary Delegate contended that under the regulations applicable at the time, a condition had to be *separately unfitting* to affect the disability rating or justify medical retirement.

8.    The Secretary Delegate further reasoned that granting the Board's recommended correction would result in Mr. Swaim receiving retroactive financial benefits. Citing Department of Defense guidance, the Secretary Delegate claimed that corrections granted *solely on the basis of injustice*—as opposed to legal error—should not "normally" result in monetary compensation. He therefore denied relief, even while acknowledging that the outcome Mr. Swaim received in 1957 was unjust.

9.    Mr. Swaim seeks to reverse this injustice perpetrated on him by this decision and he requests that the decision of the BCNR, as overturned by the Assistant General Counsel (Manpower and Reserve Affairs), as the delegate of the Secretary of the Navy (herein, the "Secretary Delegate"), dated June 6, 2024, be set aside.

10.    **First**, Mr. Swaim's claim that he had unfitting PTSD, reviewed even without the benefit of liberal consideration or the codification of 10 U.S.C. § 1216a in 2008, is supported by the Board's own medical expert who concluded that the PEB failed to consider his anxiety condition when medically separating Mr. Swaim from the Navy. The very duodenal ulcer that led the Navy to discharge Mr. Swaim was found by the Board's medical advisor to likely be a

*symptom* of his PTSD, rather than a distinct and unrelated condition, a conclusion which is clearly supported by substantial evidence. Thus, Mr. Swaim's application can be granted on the ground of error, as well as injustice because it was his PTSD and all of its associated symptoms—including a stress-induced duodenal ulcer—which led to his unfitness for duty.

11.    **Second**, Mr. Swaim's claims should be reviewed using liberal consideration, as required by the binding directives issued by the Department of Defense (DOD) between 2014 and 2018 known as the Hagel Memo, the Kurta Memo, and the Wilkie Memo (collectively, the "Directives"). See Dep't of Def., Memorandum for Secretaries of the Military Departments, Supplemental Guidance to Military Boards for Correction of Military/Naval Records Considering Discharge Upgrade Requests by Veterans Claiming Post Traumatic Stress Disorder, Sept. 3, 2014, *available at*: https://www.secnav.navy.mil/mra/bcnr/Documents/HagelMemo.pdf (the "Hagel Memo"); Dep't of Def., Memorandum for Secretaries of the Military Departments, Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment, Aug. 25, 2017, *available      at*:      https://dod.defense.gov/Portals/1/Documents/pubs/Clarifying-Guidance-to-Military-Discharge-Review-Boards.pdf    (the    "Kurta    Memo");    and    Dep't    of    Def., MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS, Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault or Sexual Harassment, August 25, 2017, *available at*: https://www.secnav.navy.mil/mra/CORB/Documents/Signed%20Memorandum%20%28Wilkie%29% 20with%20attachments.pdf (the "Wilkie Memo"). These Directives, in relevant part, direct that

modern law—**including § 1216a and DoDI 1332.18**—must be applied to <u>all</u> requests for correction involving MST-related PTSD where current law would produce a more favorable outcome. The Secretary Delegate acknowledged the applicability of these principles but failed to apply them in substance.

12.     **Third**, the Secretary Delegate's denial of relief based on the potential award of retroactive monetary compensation violates **10 U.S.C. § 1552**, which expressly authorizes Boards for Correction of Military Records—and their delegates—to "correct any military record ... when the Secretary considers it necessary to correct an error or remove an injustice," and further provides that "[a] correction under this section is final and conclusive on all officers of the United States" and may include **"pay and allowances"** as if the correction had been made at the proper time. *See* 10 U.S.C. § 1552(a)(1), (c)(1). Nothing in the statute restricts the award of monetary relief based on the reason for the correction, nor does it create an exception for corrections granted "solely on injustice grounds."

13.     Mr. Swaim seeks declaratory and injunctive relief under the APA after more than 70 years of dealing with the trauma inflicted upon him as a teenager in service to our country. Among other relief, Mr. Swaim requests an order from this Court under 5 U.S.C. § 706 setting aside the Board's denial of his application as arbitrary, capricious, and contrary to law.

## II.    <u>JURISDICTION AND VENUE</u>

14.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 as this case raises federal questions under the laws governing the United States military and the APA.  10 U.S.C. §§ 1201(b), 1203(b); 5 U.S.C. §§ 701–706.

15.     Mr. Swaim seeks exclusively declaratory and other equitable relief.  *See* 5 U.S.C. § 702.  Mr. Swaim seeks a declaration that the Board's denial of his application was arbitrary,

capricious, unsupported by substantial evidence, and contrary to law, and vacatur of the Navy's decision.

16.    The Navy's denial of Mr. Swaim's application was a final agency action for which there is no other adequate remedy in a court.  *See* 5 U.S.C. § 704.

17.    This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(e) as the Secretary of the Navy is an officer of the United States, both the BCNR and the office of the Secretary Delegate, organized under the Department of Defense (DOD), reside in Washington, D.C., and a substantial part of the acts or omissions giving rise to this lawsuit took place in the District of Columbia.

18.    In accordance with 28 U.S.C. § 2401, this action is brought within six years of the Navy's decision.

### III.    PARTIES

19.    Mr. Swaim served in the United States Navy from February 1955 until he was honorably discharged in December 1957.

20.    Mr. Swaim is a citizen of the United States and currently lives in North Carolina.

21.    Defendant John Phelan is the Secretary of the United States Navy and is named solely in his official capacity.  He is the chief officer of the United States Navy, and exercises authority, direction and control over the United States Navy.  Defendant Phelan is authorized by 10 U.S.C. § 1552 to correct the military record of any former member of the United States Navy when justice requires correction of an error or removal of an injustice.  Upon information and belief, Defendant Phelan performs a significant amount of his judicial duties within this district.

22.    Defendant United States Department of the Navy is an agency of the United States government.

7

23.    Defendant Board for Correction of Naval Records is an agency of the United States Department of the Navy, located in Arlington, Virginia. The BCNR is the board of civilians established by the Secretary of the Navy which, pursuant to 10 U.S.C. § 1552, considers applications filed before it for the purposes of determining whether an applicant's Navy military record should be changed to correct an error or injustice.

## IV.    STATEMENT OF FACTS

### A.    Military Disability and Retirement Generally

24.    Title 10, U.S.C., chapter 61, provides the Secretaries of the Military Departments with authority to retire or separate service members who, due to physical disability resulting from either illness or injury, are unable to perform their military duties. The chapter 61 medical retirement system—which remains in effect to this day—was less than ten years old at the time of Mr. Swaim's separation, having been promulgated by the Career Compensation Act of 1949, Public Law 351.

25.    When a servicemember had one or more disabilities rendering the member unfit for continued military service, they were separated from service with either (1) medical separation or (2) medical retirement. *See* 10 U.S.C. § 1201, 1206(4) (1952). Such determination turned on the disability ratings of the conditions causing the service member to be unfit for continued service as assigned by the military department.

26.    If a military department assigned the service member a disability rating of 30% or more, the service member was medically retired. 10 U.S.C. § 1201(1)– (3) (1952). If the service member was assigned a total disability rating of less than 30%, they were medically separated with a one-time severance payment. *Id*. at § 1206.

27.    Importantly, the determination as to whether a service member is unable to perform

8

their duties because of a disability focuses on the duties of that service member's office, grade, rank, or rating. *See* 10 U.S.C. § 1201 (1952) (allowing the Secretaries of the military branches to grant medical retirements when a service member is "unfit to perform the duties of his office, grade, rank, or rating because of physical disability").

28.     At the time of Mr. Swaim's separation, the application of chapter 61 was governed by Department of Defense Directive ("DODD") 1332.11 (1954), entitled "Application of Accepted Medical Principles to Determinations of Issue Involved in Application of Subsections (a) and (b) of Title IV, P.L. 351, 81st Congress." This 1954 DODD 1332.11 clearly stated that a "physical disability is *any manifest or latent impairment of function due to disease or injury regardless of the degree of impairment*," and includes "mental diseases" (emphasis added).

### B.     Military Guidance to Review Boards

29.     More than 55 years after Mr. Swaim's discharge, the DOD recognized the need to address and remedy unjust outcomes for veterans suffering from PTSD and other mental health conditions and issued a set of directives instructing the military review boards on how to better evaluate applications with a mental health condition component.

30.     In 2017, the DOD required liberal consideration to be given to veterans petitioning for a correction of their records on the basis of any mental health condition, including PTSD based on MST. The DOD's standard, evolving since 2014, was codified as a statutory "liberal consideration" standard by Congress in 2016. *See* 10 U.S.C. § 1552(h).

31.     The relevant memoranda are identified and briefly summarized as follows:

i.     The Hagel Memo mandated that all Military Boards give "liberal consideration" to requests based on claims involving PTSD or related

conditions. A true and correct copy of the Hagel Memo is attached hereto as Exhibit 1.

ii.  Memorandum Issued by Principal Deputy under Secretary of Defense, Brad Carson, dated February 24, 2016, known as the Carson Memo, clarified some of the procedures set out in the Hagel Memo, including waiver of the statute of limitations and de novo review of previously adjudicated cases that had not been reviewed with the benefit of the Directives so far. A true and correct copy of the Carson Memo is attached hereto as Exhibit 2.

iii. The Kurta Memo further clarified the application of the liberal consideration standard to cases involving PTSD, MST, and other mental health conditions. The Kurta Memo required military boards to provide liberal consideration whereby the standard for review "should rightly consider the unique nature of these cases and afford each veteran a reasonable opportunity for relief even if the sexual assault… was unreported, or the mental health condition was not diagnosed until years later" and "[i]t is unreasonable to expect the same level of proof for injustices committed years ago when…mental health conditions…and victimology were far less understood than they are today." Importantly the Kurta Memo relaxed evidentiary standards, noting that the "veteran's testimony alone, oral or written, may establish the existence of a condition or experience" of sexual trauma that occurred during military service and that such evidence may include, inter alia, "changes in behavior… deterioration in work performance… panic attack, or anxiety without an identifiable cause…." *Id*. at 2. The Kurta Memo also mandates

"liberal consideration" be used in the review of these veteran records and that such liberal consideration should include the presumptions that "mental health conditions, including PTSD ... sexual assault and sexual harassment impact veterans in many intimate ways, are often undiagnosed or diagnosed years afterwards, and are frequently unreported," and that these conditions "inherently affect one's behaviors and choices causing veterans to think and behave differently than might otherwise be expected." *Id.* at 4. A true and correct copy of the Kurta Memo is attached hereto as Exhibit 3.

iv.   The Wilkie Memo expanded the inequity, injustice and clemency standards of relief expressed in prior Directives. The Wilkie Memo expressly states that military custom and practice "favor[s] second chances," especially for certain classes of persons, including those experiencing PTSD, those having experienced MST, and those who might face sexual orientation discrimination. A true and correct copy of the Wilkie Memo is attached hereto as Exhibit 4.

32.   Mr. Swaim's case fits squarely within the universe of cases to which the Directives apply.[1] He is seeking correction of his Naval records due to his PTSD related to MST, which "was not recognized as a diagnosis at the time of service" and his diagnosis was "not made until many decades after service was completed."

33.   As Mr. Swaim was not evaluated for unfitness based on a mental health disability

---

[1] In April 2024, the DoD promulgated an additional memorandum known as the Vazirani Memorandum, which purports to (1) limit the application of liberal consideration in medical retirement cases to applications involving only PTSD or traumatic brain injury resulting from combat or MST; and (2) to limit the application of liberal consideration to questions of unfitness. Here it is undisputed that Mr. Swaim has PTSD resulting from MST, and thus still qualifies for liberal consideration under the first prong. The second prong has been challenged by multiple litigants as contrary to 10 U.S.C. 1552(h) and *Doyon v. U.S.*, 58 F.4th 1235 (2023), and is currently the subject of a challenge pending before the Federal Circuit in *Bee v. U.S.*, No. 24-2306.

at the time of separation from the Navy which would likely have provided him with a medical retirement, such decision by the Navy created both error and injustice. The BCNR found that the injustice could be easily rectified by applying the modern military retirement standards which now explicitly instruct the Navy to take into account any and all contributing conditions. Mr. Swaim's application for relief is a perfect example of the need for liberal consideration during this Board's review.

34.    Even absent the liberal consideration standard, Mr. Swaim's 1957 discharge constituted an error under the governing statutes and DoD regulations in effect at that time. Under **10 U.S.C. § 1201 (1952),** a service member was eligible for disability retirement if, while on active duty, they were found to be "physically unfit to perform the duties of his office, grade, rank, or rating." Importantly, **DoD Directive 1332.11 (1954)** required the services to assess whether "*any manifest or latent impairment of function*" rendered Mr. Swaim "unfit to perform the duties of his office, grade, rank, or rating," "*regardless of the degree of impairment*." 10 U.S.C. § 1201 (1952); DODD 1332.11 (1954) (emphasis added). This language obligated the Navy to consider all medical impairments affecting performance, whether physical or mental, and whether clearly diagnosed or understood at the time.

35.    Despite clear evidence of Mr. Swaim's significant psychological symptoms, documented during hospitalization and now understood to be manifestations of PTSD, the Navy failed to evaluate whether those symptoms independently rendered him unfit for continued service. The Navy's failure to find Mr. Swaim's mental health condition unfitting in 1957 constituted an error under the statues and regulations in effect at time. Accordingly, Mr. Swaim's discharge violated the standards then in effect, even without resorting to more recent authorities like **10 U.S.C. § 1216a** or the post-2014 "liberal consideration" directives.

C.    **Mr. Swaim's Military Career**

36.    Mr. Swaim enlisted in the U.S. Navy at 17 years old without medical defects, disqualifications, or psychiatric concerns, and served honorably on active duty from January 19, 1955, until December 16, 1957.

37.    While in initial training for five (5) months in Illinois, Mr. Swaim was physically and sexually assaulted, physically and emotionally threatened, and physically and emotionally tortured on multiple occasions by his commanding officer and others. Unable to process the trauma he experienced, Mr. Swaim quickly began deteriorating, both physically and mentally.

38.    As a result of these assaults, Mr. Swaim was hospitalized several times between 1956-1957, with doctors opining that the pain was due to nervousness and underlying anxiety. By November of 1956, Mr. Swaim was diagnosed with a duodenal ulcer. In January 1957, Mr. Swaim was hospitalized in Charleston, SC, for two (2) months for ulcer pain and received a sedative for anxiety and over-breathing.

39.    While stationed in Guantanamo Bay, Cuba, Mr. Swaim had a nervous breakdown but asked to be sent back to the United States with his ship for treatment. In July 1957, upon return to Portsmouth, VA, Mr. Swaim was hospitalized for three (3) months for treatment for ulcers and sedated with phenobarbital for anxiety.

40.    During his hospitalization in Portsmouth, Mr. Swaim purchased a typewriter to record his MST testimony. He gave the typed report to a nurse, and within a few days, Mr. Swaim was told that he was to be retired by the Navy as he was unfit for duty. That same day, Mr. Swaim was moved to another ward in the hospital and all medications were stopped.

D.    **Medical Evaluation**

41.    In September 1957, Mr. Swaim was referred to a Clinical Board review for a

determination of fitness. The clinical board noted Mr. Swaim reported "frequent episodes of hyperventilation syndrome. Previous Neuropsychiatric consultation has indicated that this was caused by anxiety reaction…[B]ecause of the chronicity of this patient's complaints and because of his previous gastrointestinal hemorrhage, it is the recommendation of the Board that he appear before a Physical Evaluation Board" ("PEB").

42.    In October 1957, the PEB reviewed Mr. Swaim's case and recommended that he was unfit to continue his military service due to his duodenal ulcer condition. The PEB rated his ulcer condition as 20% disabling, but did not consider his anxiety in its evaluation.

43.    On December 16, 1957, Mr. Swaim was honorably discharged from the Navy pursuant to a medical separation. His 20% rating meant that Mr. Swaim did not qualify for a military retirement and was denied the benefits that he needed and deserved.

**E.    Mr. Swaim has continued to live honorably and fight for benefits since 1957.**

44.    From the time of discharge from the Navy to the present time, Mr. Swaim has experienced severe symptoms of PTSD, which include anxiety, depression, suicidal thoughts and attempts, lack of concentration, inability to sleep more than three to four hours per night, intrusive ideation, nightmares, hypervigilance, and classic symptoms of attention regulation difficulties due to changes in the pre-frontal cortex due to PTSD. These manifestations resulted in years of unemployability and "shutting down his relationships with others, including family."

45.    Starting in 1959, Mr. Swaim applied for VA benefits multiple times for the same constellation of mental (anxiety) and physical (stomach and ulcer pain) symptoms that he had experienced while in the Navy. Getting no relief from about 1965 until late 1999, Mr. Swaim gave up on engaging with the VA.

46.    Beginning around December 1999 through April 2005, Mr. Swaim submitted

14

requests for the VA to reevaluate PTSD, his ulcer disability and other conditions. In its April 26, 2005 decision, the VA granted service connection for PTSD "based on your exposure to traumatic stress during your military service and currently diagnosed PTSD related to your traumatic event in military service."

47.    Currently, Mr. Swaim has a disability rating of 60 percent for his ulcer condition and a 70 percent rating for his PTSD. Over seventy years since the initial trauma, Mr. Swaim continues treatment for PTSD.

**F.    BCNR Appeal**

48.    In September 2022, Mr. Swaim filed an application with the BCNR for medical retirement. In his application, Mr. Swaim presented that despite the recommendation of his doctors for a PEB review "because of the chronicity of [this] patient's (mental health) complaints and because of his previous gastrointestinal hemorrhage…," the PEB failed to consider, address or evaluate Mr. Swaim's obvious mental health issues as part of his fitness review.

49.    As part of the BCNR's review, the Board's Physician Advisor (the "Physician Advisor"), a psychiatrist and expert in trauma related to sexual assault, reviewed Mr. Swaim's petition. In its decision, the Board included the findings of its Physician Advisor from his Advisory Opinion ("AO"). The AO stated:

> [Mr. Swaim]'s in-service diagnosis of duodenal ulcer, as well as the existence of anxiety symptoms documented during several outpatient and inpatient evaluations assessed as "nervousness," "Neurasthenia," "Hyperventilation Syndrome due to an underlying anxiety neurosis," and sedative medication during one hospitalization, support the in-service origins of [Mr. Swaim]'s gastrointestinal (Ulcers) and mental health condition (PTSD). As ***gastrointestinal conditions, such as ulcers, are frequent manifestations of chronic stress and underlying anxiety disorders***, and [Mr. Swaim] was found unfit due to his diagnosed ulcers, the Board's Physician Advisor opined that ***the evidence would support a finding of unfitness from PTSD*** as well as the ulcer condition. Accordingly, it was [Physician Advisor's] medical opinion that ***Mr. Swaim's contention that he was unfit for service due not only to his duodenal ulcer, but also for PTSD, is supported by the available clinical evidence*** (emphasis added).

15

50.    The Physician Advisor went on to recommend "that Mr. Swaim's Naval record be corrected to reflect his placed on the permanent disability retirement list as of December, 16 1957, for the following unfitting conditions: 1. Post-Traumatic Stress Disorder, VA Code 9411, rated at 30%, permanent and stable, not combat related (NCR), non-combat zone (NCZ) 2. Duodenal Ulcer, VA Code 7305, rating at 20%, permanent and stable, not combat-related (NCR), non-combat zone (NCZ), resulting in a combined rating of 44 percent."[2]

51.    Separately, the Board applied liberal consideration, finding sufficient evidence to conclude that Mr. Swaim had developed PTSD as a result of a traumatic experience during his naval service, and his MST-related PTSD contributed to the circumstances resulting in Mr. Swaim's discharge from the Navy—namely his duodenal ulcer which had already been found unfitting by the Navy in 1957.

52.    The Board found that had Mr. Swaim been found unfit for his mental health condition as well as the duodenal ulcer in 1957, his disability rating would have exceeded 30%, resulting in a medical retirement. The Board concluded it was an injustice that Mr. Swaim's mental health condition (now known as PTSD) was not factored into his fitness determination.

53.    On March 12, 2024, the BCNR recommended awarding Mr. Swaim a medical retirement (the "BCNR Decision") by correcting his DD Form 214 to reflect a medical retirement due to "Physical Disability, Permanent," removing references to severance pay, and directing that Mr. Swaim's corrected records be sent to the Defense Finance and Accounting Services to determine financial awards that would be due to Mr. Swaim.

54.    The Board referred their decision for secretarial review based on the "unprecedented [financial] nature of the relief." The BCNR Decision was reviewed by the

---

[2] The Board noted that a combined disability rating would be in multiples of 10, and such combined rating assigned by the Physician Advisor would actually be 40%.

Secretary Delegate.

55.    In his response dated June 5, 2024, the Secretary Delegate agreed there was sufficient evidence that Mr. Swaim developed PTSD from traumatic experiences in the Navy and that the evidence showed his mental health condition contributed to the development of Mr. Swaim's duodenal ulcer condition, <u>with</u> or <u>without</u> <u>liberal</u> <u>consideration</u>.

56.    However, the Secretary Delegate opined that the Board and the Board's Physician Advisor based their evaluations on a standard not in place in 1957. The Secretary Delegate stated that "the then-undiagnosed PTSD condition, if known, would have been factored into his fitness determination and disability rating *only if it was assessed as separately unfitting*" (emphasis added).

57.    The Secretary Delegate concluded erroneously that "[t]there is no evidence in the record whatsoever which suggests that [Mr. Swaim]'s mental health condition at the time raised any doubts regarding his ability to perform the duties of his office, grade, rank, or rating" and that "only [Mr. Swaim]'s physical symptoms ... rendered him unfit for continued service."

58.    The Secretary Delegate ignored the Physician Advisor's AO that "ulcers[] are frequent manifestations of chronic stress and underlying anxiety disorder" and that "the evidence would support a finding of unfitness ***from PTSD as well as the ulcer condition***" (emphasis added).

59.    The Secretary Delegate, who is not a medical provider, ignored the Board's Physician Advisor's expert medical opinion and instead proffered his own unsupported medical explanation that Mr. Swaim's mental health condition was not "separately unfitting." The Secretary Delegate then concluded that Mr. Swaim's "disability ratings…were properly calculated without consideration of contributing but not separately unfitting conditions."

60.    Separately, the Secretary Delegate acknowledged that under the guidance of the Wilkie Memo, Mr. Swaim would be certainly expected to receive a more favorable outcome under the same circumstances today. However, the Secretary Delegate concluded that a decision awarding Mr. Swaim medical retirement and remunerating him accordingly would be unjust to other veterans who had similar disability ratings at discharge.

61.    The Secretary Delegate disapproved the BCNR Decision, and on June 6, 2024, the BCNR denied Mr. Swaim's discharge upgrade to medical retirement.

62.    The Navy arbitrarily and capriciously denied Mr. Swaim relief. The Navy's decision is not in accordance with the law, is not supported by substantial evidence, and is contrary to the Directives. A true and correct copy of the decision is attached hereto as Exhibit 5.

63.    Given the Secretary Delegate's misapplication of the Directives and erroneous standards of review, Mr. Swaim filed the instant action.

## V.    LEGAL ARGUMENT

### A.    The Navy's Decision Was Arbitrary and Capricious, Contrary To Law And Unsupported By Substantial Evidence.

64.    Under the APA, a federal court can set aside an agency decision when that decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also* Ariz. Cattle Growers' Association v. U. S. Fish & Wildlife, Bureau of Land Mgmt., 273 F.3d 1229, 1236 (9th Cir. 2001).

65.    Specifically*,* an agency decision is arbitrary and capricious where "the agency…entirely failed to consider an important aspect of the problem, offered an explanation ... that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Association of U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

18

66.    Although the standard of review is inherently deferential to the agency, the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Id.* There must be a "rational connection between the facts found and the choice made." *Id. (citing Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

67.    When an agency decision is challenged, the court must "consider whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*

68.    Decisions made by the BCNR are subject to this same review. *See Chappell v. Wallace*, 462 U.S. 296 (1983) ("BCNR decisions…can be set aside if they are arbitrary, capricious or not based on substantial evidence."). Accordingly, "the final decision of the Secretary must be rational and based upon substantial evidence." *Barber v. Widnall*, 78 F.3d 1419, 1423 (9th Cir. 1996); *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001).

69.    Here, the Secretary Delegate's decision fails every element of this standard. It is arbitrary and capricious, unsupported by substantial evidence, and contrary to binding law in three fundamental respects: (1) it ignores overwhelming medical and administrative evidence of Mr. Swaim's unfitting mental health condition; (2) it incorrectly finds that Mr. Swaim's application could only be granted with the benefit of the 2008 update to the DoD's instructions regarding contributing conditions; and (3) it  openly defies the statutory command under 10 U.S.C. § 1552(h) to apply liberal consideration to claims involving PTSD from military sexual trauma..

I.    The Navy's Decision Ignored Substantial Evidence Regarding Mr. Swain's Unfitting Mental Health.

70.    The Secretary Delegate minimized and mischaracterized the evidence of Mr. Swaim's PTSD and anxiety-related impairment. Contrary to his assertion that symptoms were

isolated and resolved after two weeks of medication, Mr. Swaim's service record and the Board's own Physician Advisor—an expert in MST-related trauma—document repeated inpatient psychiatric hospitalizations, prolonged functional impairment, and serious mental health symptoms throughout service.

71.    Mr. Swaim was hospitalized for nearly five months across two facilities—two months in Charleston and three months in Portsmouth—following a nervous breakdown in Guantanamo Bay. He was sedated with phenobarbital and diagnosed with anxiety neurosis, neurasthenia, and hyperventilation syndrome. These facts are inconsistent with any finding of fitness. Cumulatively, Mr. Swaim lost nearly 15% of his total active-duty time to psychiatric hospitalization. Such extensive disruption to service functionally undermines any assertion that the Navy had "no doubts" about his fitness for continued duty.

72.    The Advisory Opinion concluded that Mr. Swaim's PTSD was not only a contributing factor to his duodenal ulcer (his basis for separation) but was itself independently unfitting. The Board accepted this conclusion, determining that, under current standards, he would have received a combined 40% rating and a medical retirement. Conversely, the Secretary Delegate rejected that conclusion without citing contrary medical opinion or addressing the psychiatric expertise presented. Instead, he substituted his own judgment—something prohibited by the Court of Veteran's Claims in cases involving the VASRD, to which the Navy is bound. *See Espiritu v. Derwinski*, 2 Vet. App. 492, 494–95 (1992); *Colvin v. Derwinski*, 1 Vet. App. 171, 175 (1991).

II.    <u>The Navy's Decision Misconstrued the Fitness Standard Set Forth in the DoD Directive of 1954.</u>

73.    The Secretary Delegate's decision rests on a legally erroneous assumption: that in 1957, military regulations required a condition to be "separately unfitting" and independently

severe to warrant disability compensation. This assumption misrepresents both current law, specifically 10 U.S.C. § 1216a(b), and the standards actually in effect at the time of Mr. Swaim's separation.

74.     Even under the 1957 regulatory framework, the decision was contrary to law. The governing authority at the time—**DoD Directive 1332.11 (Jan. 6, 1954)**—expressly defined "physical disability" to include *"any manifest or latent impairment of physical or mental function which renders an individual unable to perform the duties of his office, rank, grade, or rating regardless of the degree"* (emphasis added). The directive made clear that conditions did not have to be independently severe or stand alone to be relevant to an unfitness determination. Instead, the standard required a holistic evaluation of all impairments that impacted performance, whether alone or in combination.

75.     Under that 1954 standard, the Board correctly recognized that Mr. Swaim's PTSD—although not labeled as such in 1957—was a contributing cause of his disabling duodenal ulcer. The Board's finding was well-grounded: PTSD symptoms exacerbated his ulcer, and both conditions collectively rendered him unfit. Contrary to the Secretary Delegate's reasoning, a contributing condition like PTSD did not need to meet some artificial threshold of "separate unfitness" to be compensable. The applicable law required that all function-impairing conditions be considered in evaluating a service member's overall fitness and eligibility for retirement.

76.     By insisting that PTSD must have been "separately unfitting" to be relevant, the Secretary Delegate not only disregarded the governing 1954 DoD standard, but also contravened modern requirements under 10 U.S.C. § 1216a(b), which mandates consideration of "*all medical*

*conditions, whether individually or collectively*." The result is a decision that is arbitrary, capricious, and contrary to law under 5 U.S.C. § 706(2)(A) and (C).

III.    The Secretary Delegate Violated 10 U.S.C. § 1552(h) by Failing to Apply Liberal Consideration and Improperly Disregarding the Board's Findings.

77.    The Secretary Delegate's reversal of the Board's decision further violated 10 U.S.C. § 1552(h), which mandates liberal consideration of claims based on PTSD related to military sexual trauma (MST). The statute requires that "a board established under subsection (a)(1) shall ... review the claim with liberal consideration to the claimant that post-traumatic stress disorder [due to MST] ... potentially contributed to the circumstances resulting in the discharge." 10 U.S.C. § 1552(h)(2)(B).

78.    The standard for "liberal consideration" is articulated in the 2017 Kurta Memo, not the 2018 Wilkie Memo as incorrectly cited by the Secretary Delegate. The Kurta Memo explicitly states: "Veterans discharged under prior procedures, or before verifiable diagnosis, may not have suffered an error because the separation authority was unaware of their condition or experience at the time of discharge. However, when compared to similarly situated individuals under today's standards, they may be the victim of injustice ...." Kurta Memo at 4.

79.    This policy mandates use of modern standards to assess whether historic separations were unjust and Mr. Swaim's case fits squarely within § 1552(h)'s protections. He sought relief based on PTSD resulting from MST, and the Board applied the required liberal consideration standard. The Board expressly found that Mr. Swaim suffered from MST-related PTSD, that his service records reflected symptoms consistent with that condition, and that his PTSD contributed to the circumstances of his discharge. The Board further concluded that, had the PTSD been considered in conjunction with his duodenal ulcer, Mr. Swaim would have been medically retired rather than separated.

80.     Accordingly, the Board was legally correct to apply today's disability evaluation framework in concluding that Mr. Swaim would have been medically retired had PTSD been recognized and rated along with his ulcer.

81.     Nonetheless the Secretary Delegate rejected the Board's findings—even while acknowledging that Mr. Swaim's PTSD would likely result in a favorable outcome *today*—contending the Wilkie Memo discourages awarding benefits in cases where relief is based solely on injustice.

82.     That reasoning is deeply flawed. First, Mr. Swaim did not receive relief "solely on injustice;" his relief was required under statutory and regulatory standards. Second, the Wilkie Memo cannot override the express statutory requirement of liberal consideration under § 1552.

83.     The Federal Circuit's decision in Doyon v. United States, 58 F.4th 1235 (Fed. Cir. 2023), confirms the binding nature of liberal consideration. The court held that both the Kurta Memo and § 1552(h) apply to claims for medical retirement, and that liberal consideration is not discretionary. *Id.* at 1245–46. The requirement applies *at the time the final decision is made,* not merely at the initial separation. *Id.* at 1245. Accordingly, the Secretary Delegate's failure to apply liberal consideration was a violation of law.

## VI.     CLAIM FOR RELIEF

### (Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary, Capricious, and Otherwise Not in Accordance with Law)

84.     Mr. Swaim realleges and incorporates the allegations set forth in paragraphs 1 through 83 hereof, as if fully set forth herein.

85.     The Secretary Delegate's June 6, 2024, decision letter constitutes final agency action under the APA. Mr. Swaim's unsuccessful application to the BCNR was the last available

administrative remedy for review of his separation from the Navy.

86.    The BCNR's denial of Mr. Swaim's application is arbitrary, capricious, unsupported by substantial evidence and otherwise not in accordance with law for at least three reasons.

87.    *First*, the Secretary Delegate merely adopted his own medical analysis based on a limited selection of Veteran Swaim's medical records, without the consideration of the report from the Board's own physician expert's analysis and opinion.

88.    *Second*, the Secretary Delegate misinterpreted past and present binding law.

89.    *Third*, the Secretary Delegate refused to apply liberal consideration.

90.    As a direct result of Defendants' actions, Mr. Swaim has been, and continues to be, deprived of the benefits of a medical retirement to which he was and is entitled.

## VII.    PRAYER FOR RELIEF

1.    WHEREFORE, Mr. Swaim respectfully requests that the Court enter judgment against the Defendant and enter an order that provides the following relief:

**a.**    Finds that the Navy's final decision was arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence;

**b.**    Sets aside such decision under 5 U.S.C.§ 706(2)(A);

**c.**    Award costs, and attorneys' fees; and

**d.**    Grants such other and further relief this Court deems just and appropriate.

Dated:  August 4, 2025

Respectfully submitted,

*/s/ Kevin E. Gaunt*

Esther Leibfarth (DC Bar No. 1016515)
Rochelle Bobroff (DC Bar No. 420892)

Kevin E. Gaunt (DC Bar No. 1008697)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave, NW Suite 900
Washington, DC 20037-1701
Telephone: (202) 419-2182
kgaunt@hunton.com

NATIONAL VETERANS LEGAL
SERVICES PROGRAM
1100 Wilson Blvd., Suite 900
Arlington, VA 22209
Phone: (202) 621-5681
esther@nvlsp.org
rochelle@nvlsp.org

Angelina M. Yearick*
HUNTON ANDREWS KURTH LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 850-2813
angelinayearick@huntonak.com

*pro hac vice motion forthcoming*

*Counsel for Plaintiff*